Joseph R. EBRON, Appellant,

v.

UNITED STATES, Appellee.

Steven Goode, Appellant,

v.

United States, Appellee.

No. 99–CF–145.

District of Columbia Court of Appeals.

Argued Dec. 13, 2001.

Decided Dec. 24, 2003.

Stuart Fisk Johnson, appointed by the court, for appellant Joseph R. Ebron.

Timothy P. O'Toole, Public Defender Service, with whom James Klein, Public Defender Service, was on the brief, for appellant Steven Goode.

David C. Berry, Assistant United States Attorney, with whom Kenneth L. Wainstein, United States Attorney at the time the brief was filed, and John R. Fisher, and Roy W. McLeese, III, Assistant United States Attorneys, were on the brief, for appellee.

Before WAGNER, Chief Judge,
FARRELL and WASHINGTON,
Associate Judges.

WAGNER, Chief Judge:

In a joint trial by jury, appellants, Steven Goode and Joseph R. Ebron, were convicted of conspiracy to murder Gregory Epps (D.C.Code § 22–105(a) (1996)),[1] first-degree murder while armed of Anthony Tate (D.C.Code §§ 22–2401, –3202 (1996)),[2] assault with intent to kill while armed of Clarence Settle (D.C.Code §§ 22–501, –3202 (1996)),[3] two counts of possession of a firearm during a crime of violence (assault and murder) (D.C.Code § 22–3204(b) (1996)),[4] carrying a pistol without a license (D.C.Code § 22–3204(a) (1996)) and carrying a dangerous weapon (D.C.Code § 22–3204(a)). Both appellants argue for reversal on the grounds that the trial court erred in admitting prejudicial evidence consisting of: (1) testimony and argument concerning throat-slashing gestures two spectators made during the testimony of a key witness for the government; (2) improper argument by the prosecutor that a government witness' inability to identify appellants was the result of threats and intimidation that occurred in the courtroom; and (3) irrelevant testimony of a witness that encouraged the jury to speculate that appellants had a drug or gang-related motive for the killing and that unfairly tarnished the character of a key defense witness. Alternatively, if a new trial is not ordered, appellants request remand for an evidentiary hearing to address the government's refusal to produce timely impeachment material in compliance with *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). Appellant Ebron also challenges as improper: (1) the admission of evidence concerning shots fired at Bernard Pinckney in the community by an unknown assailant;

---

1. This section has been recodified as D.C.Code § 22–1805 (2003).

2. These sections have been recodified as D.C.Code §§ 22–2101, –4502 (2003).

3. These sections have been recodified as D.C.Code §§ 22–401, –4502 (2003).

4. This section has been recodified as D.C.Code § 22–4504 (2003).

and (2) the government's impeachment of a witness, Gregory Epps, with information related to his pending first-degree murder trial and his failure to report that he was robbed to the police. Finding no reversible error in Ebron's case, we affirm his convictions. Concluding that appellant Goode was prejudiced unfairly by the improper admission of evidence and argument against him of witness intimidation without any showing that he was linked to the threats, we reverse for a new trial as to Goode.

## I.

### Factual Background

Clarence Settle testified that on May 24, 1997, while he was on his front porch in Southeast Washington talking with his cousin, Anthony Tate, he heard what sounded like a firecracker. He then saw a man, who was approximately 5'5" tall, weighing about 135 pounds, step from behind a wall and fire a weapon that appeared to be a rifle. Settle said that he then heard what sounded like an automatic weapon firing. Afterwards, Settle, who was hit by bullets in the ankle and thigh, went to check on Tate and found him lying on the front porch suffering head wounds from which he later died. The government's theory was that Tate was the unintended victim of the intended shooting of Gregory Epps by appellants.

Eugene Rogers testified that at the time of the shooting, he was sitting in a parked car on the other side of the street drinking alcohol with three other people when he saw two men, one approximately 5'9" tall, and the other shorter, fire shots across the street. Gregory Bean testified that he was barbecuing in his backyard when he saw two men in the alley. After the men left the alley, Rogers heard automatic weapon gunfire and "a couple of blasts" and saw two people run down the alley into a nearby building. Rogers testified that he could not identify the two men, but they were less than 5'10" tall. He had been drinking also.

Bernard Pinckney testified that Ebron and Goode were at his apartment when they planned to shoot Gregory Epps and that Stanley Richardson was there also. According to Pinckney, a woman named Carolyn came to the door and asked for Ebron, and Ebron went outside with her. Ebron returned a few minutes later and told Pinckney and Goode, "He [is] out there, let's go." Ebron and Goode then left the apartment, but returned about ten minutes later wearing jackets (one a coat, and the other, a sweathood). Pinkney testified that Goode had an AK–47 rifle, and Ebron had what looked like a .32 caliber automatic pistol. He testified that "Little Greg" Epps was the target of the shooting and that Ebron and Goode were the shooters. Pinckney admitted that he had obtained from Rose Brown or her sister a key to the gate behind his building through which the shooters passed before shooting Tate and Settle, but he denied that he opened the gate.[5]

Rose Brown testified that she saw Goode and Ebron wearing jackets that day, which seemed inappropriate for the weather. She said that they were carrying a gym bag that was about two and one-half feet long with two handles and a strap. Ms. Brown denied opening the gate for Pinckney. She recounted that the year before, Goode and Ebron came up to her and others and asked if they had seen Little Greg out there, and she responded, "Yeah, maybe, I don't know," but explained that she could not remember exactly what she said. She testified that

---

5. Detective Timothy A. Dowdy testified that Pinckney also said that he procured the getaway car which arrived at his house after the shooting.

Goode and Ebron then said they were going to kill Epps.

Ebron testified that he and Goode had a troubled relationship with Pinckney, who had become quite angry when Ebron's sister, who had a relationship with Pinckney, moved with the couple's two children to Maryland. He said that neither he nor Goode had anything against Epps and that they had never tried to kill him.

## II.

Appellants argue that the trial court erred in allowing the admission of prejudicial and inflammatory evidence. Specifically, they refer to testimony elicited by the prosecutor from the witness Pinckney concerning throat-slashing gestures that two spectators allegedly made while he was testifying. Appellants contend that the requisite foundation for admission of this evidence was not laid, as there was no showing that the gestures were made by appellants or with their knowledge or authorization. They contend that this evidence and the related argument by the prosecutor jeopardized the fairness of the trial and had a substantial impact on its outcome. The government responds that the evidence was properly admitted. Further, it contends that appellant Goode did not assert in the trial court that the basis for his objection was an insufficient showing of a connection between him and the spectators or make a claim of unique prejudice, and therefore that a plain error standard applies. We outline first the context in which the testimony occurred and whether the plain error standard applies, before turning to an analysis of the arguments in light of the applicable legal principles.

### A. *Factual Context for Admission of Threats Evidence*

The prosecutor reported during a bench conference that he learned from Mr. Pinckney that a spectator had made a throat-slashing motion while he was testifying and that he recognized that person because he was frequently around Ebron and Goode in the neighborhood. Counsel for Ebron objected, and the court stated that it understood the objection. The court then expressed concern about whether that type of gesture might be intimidating to the jurors and acknowledged that whether the evidence was more prejudicial than probative was an issue. Goode's counsel objected, explaining that the gesture "doesn't necessarily mean that it was because of Mr. Ebron and Mr. Goode." Counsel for Ebron added that neither he nor his intern had seen the spectator's conduct and that such gestures could be misinterpreted. The court responded that defense counsel could call a witness in the defense case.

When Pinckney resumed his testimony before the jury, the prosecutor elicited that Pinckney recognized a person in the gallery who had made a throat-slashing gesture while he was testifying. Pinckney demonstrated the throat-slashing gesture by moving his finger across his neck. The prosecutor asked Pinckney whether he had ever seen the person with either Ebron or Goode, and Pinckney responded that he had. The prosecutor then asked Pinckney how often, and his response was, "he usually be out there every day. I go walk to the store, see him down there, down there hustling, you know." The trial court sustained appellant Ebron's objection and ordered the "hustling" remark to be stricken from the record.

In an effort to refute Pinckney's testimony concerning the spectator's gestures, appellant Ebron called Roshetta Harris as a witness. Ms. Harris testified that during Pinckney's testimony, two young men tried to get her attention, moved to a seat behind her, tapped her on the shoulder and asked for her telephone number. She

said that the men returned to their seats, but continued to stare at her.

Over defense objection, the government called as a rebuttal witness, John Ludwig, an inspector deputy U.S. Marshal assigned to the witness protection program. He testified that he was seated behind Pinckney during his testimony and that he saw Ebron cock his head and point back toward the audience, make visual contact with two spectators and rub his chin down towards his throat. He testified that this happened three or four times and that each time, the two spectators would move across the courtroom into Pinckney's sight line and make throat-slashing gestures. In cross-examination, Goode's counsel asked the witness if he had seen Goode interact with the spectator, and the witness responded that he had not.

### B. *Preservation of Threats Issue for Review*

■ First, the government argues that appellant Goode's argument that he was prejudiced by the introduction of the threats evidence must be reviewed for plain error because it was not adequately preserved. It contends that although Goode made a general objection to the evidence, he failed to argue that the basis for his objection was an insufficient foundation linking him to the alleged threatening gestures. Goode contends that the objections made were sufficient to satisfy the contemporaneous objection rule.

■ A party objecting to the admission of evidence must do so timely. *Mercer v. United States*, 724 A.2d 1176, 1182 (D.C.1999). "To be considered timely, an objection must 'permit the court to take appropriate and effective corrective action.'" *Id.* (quoting *Coreas v. United States*, 565 A.2d 594, 600 (D.C.1989)) (other citations omitted). The objecting party must also state grounds for the objection. Super. Ct.Crim. R. 51. Objections must

be made with specificity in order to fairly apprise the court of the question presented. *Hunter v. United States*, 606 A.2d 139, 144 (D.C.1992). If the trial court has ruled on the substance of the objection, this court will review the trial court's decision on admissibility of evidence for an abuse of discretion, even though it is not clear that the party objected contemporaneously. *Id.* (citations omitted). If the party has not preserved the issue by an adequate and timely objection, we review for plain error, *i.e.*, error so clearly prejudicial to substantial rights that the fairness and integrity of the trial was jeopardized. *Id.* (citing *Mills v. United States*, 599 A.2d 775, 787 (D.C.1991)).

Applying these principles, we conclude that the objections were timely and adequate to preserve the issue for review. In making the objection, Goode's counsel argued that the fact that gestures might have been made "doesn't necessarily mean that it was because of Mr. Ebron and Mr. Goode." This statement was sufficient to alert the court that the basis for the objection was that there was no showing that appellants had authorized or set this intimidating conduct in motion. It adequately informed the court that the basis for the objection was the failure to show that appellants were responsible for or connected to the spectators' conduct. As such, it was sufficient to apprise the trial court, as required, of the issues on which it was being asked to rule. *See Tindle v. United States*, 778 A.2d 1077, 1082 (D.C.2001); *Brown v. United States*, 683 A.2d 118, 126 n. 9 (D.C.1996). It satisfied the purpose behind the contemporaneous objection rule, *i.e.*, putting the court on notice of the objection, the reason for it, and the relief sought. *See Williams v. United States*, 382 A.2d 1, 7 n. 12 (D.C.1978). Similarly, we conclude that the objection by Ebron's counsel, specifying an additional reason for the objection, was sufficient to include him

in the ground advanced by Goode's counsel, *i.e.,* the lack of a link between the spectators and himself. After Goode's counsel specified this basis for objecting, there was no need for Ebron's counsel to restate the foundational challenge. He started his statement of reasons with the word "also," as if advancing an additional ground, not simply a separate one. For these reasons, we reject the government's argument that the objection to the threats evidence is subject to plain error review.

### C. *Applicable Legal Principle for Admissibility of Threats Evidence*

Appellants argue that the trial court committed reversible error in allowing the prosecutor to elicit from Pinckney testimony concerning throat-slashing gestures made by two spectators during his testimony solely on the basis that they were seen together frequently in the neighborhood. The government argues that the evidence was relevant to show Ebron's consciousness of guilt, to rehabilitate Pinckney after his motive for participating in the witness-protection program was challenged, and to bolster Pinckney's credibility after appellants suggested that he should not be believed because he had waited more than a month to convey information concerning the shooting.

▮ "Generally, evidence showing the bias or motivation of a witness may be relevant in assessing the witness' credibility." *Mercer, supra,* 724 A.2d at 1184 (citing *Springer v. United States,* 388 A.2d 846, 855 (D.C.1978)). When shown to be relevant, such evidence should be excluded only when " 'its probative value is substantially outweighed by the danger of unfair prejudice.' " *Id.* (quoting *(William ) Johnson v. United States,* 683 A.2d 1087, 1090 (D.C.1996) (en banc)). Evaluating and weighing evidence for relevance is within the trial court's discretion, and we accord its decision in that regard great deference.

*Id.* at 1185 (quoting *(William ) Johnson,* 683 A.2d at 1095)). Nevertheless, evidence of threats against a witness is recognized as having a great potential for prejudice to the accused. *Id.* at 1184 (citing *United States v. (Paris) Thomas,* 86 F.3d 647, 653–54 (7th Cir.1996); *Dudley v. Duckworth,* 854 F.2d 967, 970–71 (7th Cir.1988), *cert. denied,* 490 U.S. 1011, 109 S.Ct. 1655, 104 L.Ed.2d 169 (1989) (other citation omitted). Therefore, we have cautioned that the admission of such evidence should be limited, "unless admitted to explain specific behavior of the witness, such as inconsistent statements, delay in testifying, or unusual courtroom demeanor." *Id.* (citing *(Paris) Thomas,* 86 F.3d at 654). It has been held to be an abuse of discretion for the trial court to admit such evidence solely for the purpose of reflecting on the general credibility and bias of the witness. *See id.* (citing *(Paris) Thomas,* 86 F.3d at 654). Further, "this court has admonished against engaging in tactics that promote the concept of 'guilt by association.' " *Id.* at 1185 (citing *Funchess v. United States,* 677 A.2d 1019, 1021 (D.C.1996)) (other citation omitted).

▮ Evidence that a defendant made threats to witnesses against him in a criminal proceeding is relevant to show the defendant's consciousness of guilt. *Byers v. United States,* 649 A.2d 279, 286 n. 3 (D.C.1994) (citing *Smith v. United States,* 312 A.2d 781, 784–85 (D.C.1973) (other citation omitted); *see also Roy v. United States,* 652 A.2d 1098, 1108 n. 22 (D.C. 1995). Evidence of threats against a witness may be admitted also to explain why the witness delayed in reporting a crime and " 'courtroom demeanor indicating intimidation" ' may also be admitted " 'to account for the specific behavior of a witness that, if unexplained, could damage a party's case.' " *Foreman v. United States,* 792 A.2d 1043, 1049 (D.C.2002) (citing

*(Paris) Thomas, supra,* 86 F.3d at 653–54). Applying these principles, we consider appellants' arguments concerning the admission of the threats evidence.

### 1. *Goode's Challenge*

 Appellant Goode argues that it was reversible error for the trial court to admit the evidence of throat-slashing gestures against him and to permit the government to suggest in closing argument that these threats were linked to him. He contends that the government improperly imputed to him the actions of the courtroom spectators based solely upon his having been seen with them in the neighborhood. He argues that this was an insufficient foundation for the admission of such in flammatory evidence against him.

 This court has recognized the prejudice that results from admitting witness intimidation evidence, particularly absent a foundation linking the evidence to the accused. *See Mercer, supra,* 724 A.2d at 1184. It is improper to admit evidence of a defendant's connection to a group of people of questionable character if not relevant to some other factual issue. *Id.* at 1185. " 'Since threats tend to show guilty knowledge or an admission of guilt on the part of the defendant, a proper foundation must be laid showing the threats were made either by the defendant or with his or her knowledge or authorization.' " *Dudley, supra,* 854 F.2d at 970 (quoting *Cox v. State,* 422 N.E.2d 357, 361–62 (Ind. App.1981)); *see also Mercer,* 724 A.2d at 1184; *United States v. Rios,* 611 F.2d 1335, 1349 (10th Cir.1979) ("Generally references to threats or danger to prosecution witnesses are improper" unless there is evidence connecting the accused to the danger).

Here, the government throughout the testimony of Pinckney, attributed to Goode the threatening actions of the spectators based solely on their association with him

in the neighborhood. It does not contend on appeal that appellant Goode had any link to the spectators or their conduct other than having been seen in the neighborhood together with them. A neighborhood association, the only nexus provided in this case, is not an adequate foundation for the admission of the evidence to prove Goode's consciousness of guilt. *See Mercer, supra,* 724 A.2d at 1185, 1187.

In *Mercer,* we found improper the prosecution's attempt to intimate that the defendants were friends with courtroom spectators and to create the impression that the spectators were there to influence the testimony of witnesses. 724 A.2d at 1184. Although the prosecutor did not use the words "intimidation or threat," he nevertheless created the impression that the spectators were there to intimidate witnesses by linking a witness' contradiction of his grand jury testimony to the presence in the courtroom of spectators from the neighborhood where the crime was committed. *Id.* at 1187. We observed that such tactics were fraught with unfair prejudice because: (1) "they suggest to the jury a decision based on 'guilt by association' "; and (2) "the evidence plays on the passions and fear of the jury, by suggesting that a threat exists against the witnesses." *Mercer,* 724 A.2d at 1187 (citing *McClellan v. United States,* 706 A.2d 542, 551 (D.C.1997)).

The conduct of the spectators here was not shown to reflect Goode's thinking because no evidence associated him with their actions in the courtroom. *See Dudley, supra,* 854 F.2d at 970 (citations omitted). The menacing conduct was, therefore, irrelevant to prove Goode's conduct or behavior. *See Foreman, supra,* 792 A.2d at 1049 (to be relevant, evidence must be probative of the fact it is intended to establish) (citations omitted). Absent any showing that the threats were made with

Goode's knowledge or authorization, this highly prejudicial evidence should have been excluded as to him. *Dudley,* 854 F.2d at 970 (citation omitted).

▬▬▬ The main thrust of the government's responsive argument is that the plain error standard applies.[6] We have rejected the government's argument that the plain error standard applies in this case, since appellant adequately asserted the lack of foundation as a basis for his objection. Therefore, our standard of review for harmless error requires us to determine whether we can say with fair assurance, without stripping the erroneous action from the whole, that the error did not sway the verdict. *See Kotteakos v. United States,* 328 U.S. 750, 764–65, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946); *Mercer, supra,* 724 A.2d at 1194 (citations omitted). The question is " 'whether the error itself has substantial influence.' " *Barron v. United States,* 818 A.2d 987, 993 (D.C. 2003) (quoting *Kotteakos,* 328 U.S. at 764–65, 66 S.Ct. 1239). "In making this determination, the appellate court 'must weigh the severity of the error against the importance of the determination in the whole proceeding and the possibility for prejudice as a result.' " *Mercer,* 724 A.2d at 1194 (quoting *(James W.) Johnson v. United States,* 398 A.2d 354, 367 (D.C.1979)). The critical factors for that determination are: " 'the closeness of the case, the centrality of the issue affected by the error, and the steps taken to mitigate the effects of the error.' " *(William) Thomas v. United States,* 557 A.2d 1296, 1303 (D.C. 1989) (quoting *Gaither v. United States,* 134 U.S.App. D.C. 154, 172, 413 F.2d 1061, 1079 (1969)). Addressing each of these factors, we conclude that the error was not harmless.

Contrary to the government's argument, we conclude that this was a close case.

None of the eyewitnesses could identify appellants as the shooters, even though some were able to provide the heights for the individuals. A neighbor, Gregory Bean, saw the shooters twice that day, but he did not recognize them as appellants. There was no physical evidence linking appellants to the crime. Therefore, proof of the government's case depended essentially upon the credibility of two witnesses, Bernard Pinckney and Rose Brown. Both of these witnesses were impeached with prior inconsistent statements and motives for not telling the truth. Indeed, there was evidence that Pinckney was involved in the events related to the crimes and was initially a suspect. The evidence showed that Pinckney obtained the key from Brown and opened the gate through which the shooters proceeded on their way to the shooting, and secured the car used by the shooters to leave the area later. The jury deliberated five days, and the court found it necessary to provide an anti-deadlock instruction. Under these circumstances, we cannot say that the government's case was overwhelming. *See Dallago v. United States,* 138 U.S.App. D.C. 276, 289, 427 F.2d 546, 559 (1969) (observing that had the case been overwhelming, the jury would be expected to reach a decision in less than five days).

The threats evidence was central to the case because it was used not only in an effort to show appellants' consciousness of guilt, but also to show that the government's key witness, Pinckney, had reason to fear appellants and for that reason had delayed in reporting their participation in the crime and his entry into the witness-protection program. However, in order for such evidence to be relevant to these issues, there must be some proof that the witness' fear is related to appellant. *See*

---

**6.** The government contends that there was a proper foundation for admission of the evi-

dence against appellant Ebron, an issue we address in the next subsection.

*Mercer, supra,* 724 A.2d at 1187. As to Goode, no such relationship was shown. This makes it difficult to conclude that the evidence and the government's argument based thereon was harmless.

The government argues that any prejudice created by the threats evidence was ameliorated because counsel for Goode was able to establish that Deputy Marshal Ludwig did not see Goode interact with the men in the courtroom who made the threatening gestures. We cannot agree that this was sufficient to mitigate the harm under the circumstances. Here, the trial court's ruling permitted the jury to attribute the spectators' threats to Goode, based upon evidence that they had been seen in the neighborhood with him and Ebron. Under these circumstances, it is unlikely that the jurors would disassociate Goode from the evidence of witness intimidation solely because he was not observed signaling his associates that day.

Moreover, the prosecutor took no steps in closing argument to disassociate Goode from the spectators and their threatening behavior. Indeed, their actions surrounding the shooting of Tate, he explained, "tie[ ] into everything that you saw in this courtroom." A theme of his argument was the "disdain" both defendants, and their witness Gregory Epps, had shown "for the system" by handling their disputes violently "out on[ ] the streets." This attitude extended into the courtroom as well, for "people who come into the courtroom ... to tell what they know ... about Mr. Goode and Mr. Ebron receive the same dis[d]ain." In particular, the jury had seen "Mr. Pinckney as he sat here on this witness stand [and] had to put up with two

gentlemen in the gallery, ... these kind of motions going on in the back of this courtroom." When Pinckney "tells you that these two young men were back in that gallery going like this to him," the prosecutor continued, "[i]t's the disdain, the contempt for the system .... [i]t's the contempt that each of these gentlemen behind me [the defendants] share for human life." Altogether, then, the jury was invited to consider both "the evidence from ... the witness stand" about the defendants' culpability and also "the evidence that went on in this courtroom during [the] trial." In rebuttal, the prosecutor returned to this theme briefly, explaining that the government's witness Rose Brown had been offered witness protection "[f]or a reason[,] ... a lot of [which] relates to what happened in this courtroom." No effort was made to exclude Goode from the inferences that could be drawn from the "disdain[ful,]" menacing conduct of the spectators in the courtroom.

The foregoing analysis of the three factors decisive in determining harmlessness of the erroneous admission of the threats evidence weighs against the government in this case. Under the circumstances, a new trial is warranted for appellant Goode.

### 2. *Ebron's Challenge*

██ Appellant Ebron is in a different position than appellant Goode in challenging the evidence of the throat-slashing gestures made in the courtroom. Deputy Marshal Ludwig testified that while Pinckney was testifying, Ebron communicated three or four times by gesture with the spectators, including a movement from his chin to his throat.[7] According to Deputy

---

7. We are not persuaded by Ebron's argument that reversal is required because the evidence that he procured and participated with the spectators in the threatening gestures was developed in the government's rebuttal case. Even though that connection should have been established earlier, Ebron cannot complain that factually there was no showing of the requisite nexus between him and the intimidation of the witnesses. Moreover, Ebron did not request an opportunity to rebut the evidence of his participation in the threatening conduct.

Marshal Ludwig, the spectators responded each time by moving to a position in the courtroom where Pinckney could see them and then making throat-slashing gestures. This testimony provided a clear connection between Ebron and the spectators' threatening conduct. The evidence provided a basis for concluding that Ebron procured or authorized the spectators, with whom he had an association, to make the threatening gestures. Thus, unlike Goode's case, as to Ebron, the evidence met the foundational requirement of showing that " 'the threats were made either by the defendant or with his ... knowledge or authorization.' " *Dudley, supra,* 854 F.2d at 970 (citations omitted); *see also Mercer, supra,* 724 A.2d at 1184–85. Therefore, the evidence, if relevant, was admissible against Ebron.

■■■ The government argues that the evidence was relevant: (1) to show Ebron's consciousness of guilt of the underlying offense; (2) to rehabilitate Pinckney's testimony after his motives for participating in the witness-protection program were questioned; and (3) to explain Pinckney's delay in waiting a month before reporting the shooting. Evidence that a defendant made threats to witnesses against him in a criminal proceeding is relevant to show defendant's consciousness of guilt. *Byers, supra,* 649 A.2d at 286 n. 3 (citing *Smith, supra,* 312 A.2d at 784–85) (other citation omitted); *see also Roy, supra,* 652 A.2d at 1108 n. 22. Such evidence is not being admitted for the improper purpose of showing criminal propensity, but rather for the legitimate purpose of showing consciousness of guilt. *United States v. Gatto,* 995 F.2d 449, 454 (3d Cir.1993) (citation omitted). Since there was evidence that Ebron authorized or participated in intimidating conduct against Pinckney during trial, the threats evidence was properly admitted to show his consciousness of guilt. *See, e.g., United States v. Mickens,* 926 F.2d 1323, 1328–29 (2d Cir.1991), *cert.*

*denied,* 502 U.S. 1060, 112 S.Ct. 940, 117 L.Ed.2d 111 (1992) (evidence that defendant made a hand gesture in the shape of a gun in order to intimidate a key prosecution witness was probative of defendant's consciousness of guilt).

We have also recognized, as the government contends, that evidence of threats against a witness may be admitted to explain why the witness delayed in reporting the crime and " 'courtroom demeanor indicating intimidation.' " *Foreman, supra,* 792 A.2d at 1049 (citing *(Paris) Thomas, supra,* 86 F.3d at 653–54). The government argues that, under these principles, the evidence of threatening gestures was also admissible to explain that Pinckney delayed in reporting the crimes and entered the witness-protection program because of fear for his safety. We do not agree that these two asserted grounds of relevance are applicable here. Pinckney's delay in coming forward and his entry into the witness-protection program came well in advance of the trial when the threatening gestures were said to have occurred. Thus, they cannot account for his decisions in regard to either of these events. *See id.* While the evidence might tend to show that Pinckney's fears were not baseless, its principal relevance was related to Ebron's consciousness of guilt.

■■■ That does not end our inquiry, however, as admissible evidence may be excluded if its probative value is substantially outweighed by its prejudicial effect. *See Clayborne v. United States,* 751 A.2d 956, 963 (D.C.2000) (citations omitted). The probative/prejudice analysis is " 'quintessentially a discretionary function of the trial court, and we owe a great deal of deference to its decision.' " *Id.* (quoting *Mercer, supra,* 724 A.2d at 1185) (other citation omitted). Evidence that appellant Ebron procured and participated in threats to a testifying witness is highly

probative of his own consciousness of guilt as well as to the witness' manner of testifying that the jury would be called upon to assess. "An exercise of judicial discretion 'will not be reversed unless it appears that it was exercised on grounds, or for reasons, clearly untenable or to an extent clearly unreasonable.'" *Id.* at 963 (quoting (*James W.*) *Johnson, supra,* 398 A.2d at 363) (other citation omitted). That is not the case here. Therefore, we find no abuse of discretion in the trial court's ruling.

### III.

■ Appellants make a number of other arguments for reversal, none of which we find persuasive. First, they argue that the trial court erred in allowing the government to argue, without evidence, that Gregory Bean could identify the shooters, but did not do so out of fear. Read in context, we are not persuaded that the prosecutor's argument conveyed the meaning asserted by the defense.[8] The argument, which is reproduced in the margin, did not suggest that the witness actually knew who the shooters were that night, but failed to identify them only out of fear.[9] There was evidence that the witness was thinking about his safety after the shooting and that he was not trying to determine the identities of the shooters. The prosecutor's argument can be considered a fair comment on the evidence and

the reasonable inferences therefrom. *See Streater v. United States,* 478 A.2d 1055, 1058–59 (D.C.1984). At most, the argument might be viewed as somewhat ambiguous. In that case, we "should not lightly infer that a prosecutor intends an ambiguous remark to have the most damaging conceivable meaning, or that the jury will so understand it." *Dixon v. United States,* 565 A.2d 72, 79 (D.C.1989) (citation omitted).

■ Appellants argue that the trial court erred in allowing the prosecutor to question a key defense witness, Epps, about a gang-related murder and his gang affiliation. They contend that the prosecutor's questioning had no legitimate basis and conveyed the impression that appellants were dangerous drug dealers who tried to kill Epps, a rival drug dealer. The government responds that the cross-examination was proper, and even assuming error, it was harmless.

In testifying for the government, Pinckney stated that Epps was the target of the shooting that night. In response, the defense called Epps to the stand, and he testified that he, Ebron and Goode were friends, although he had problems with Pinckney, including that Pinckney had tried to rob him some years earlier. The trial court then allowed the government to question Epps about whether he had allegiances to drug gang members who were

8. The argument complained of consisted of the following:
 *Prosecutor:* ... Gregory Bean never makes an identification, never points across the courtroom, doesn't stare into anybody's face that night. And I know, ladies and gentlemen, that you appreciate why. As you put this altogether [sic] and consider ....
 *Ebron's Counsel:* Objection, Your Honor.
 *Court:* Objection is overruled.
 *Prosecutor:* ... the evidence from not only the witness stand but the evidence that went on in this courtroom during this trial.

9. This case is not like *McClellan, supra,* upon which appellants rely. In *McClellan,* the government, "in direct conflict with [the witness's] sworn testimony, [stated] that [she] had seen [the defendant's] face and was afraid of retaliation since she could identify him." 706 A.2d at 553. Thus, the prosecutor had asked the jury to draw inferences not supported by the evidence. *Id.* Here, there was some evidentiary support for the argument.

in competition with a gang to which appellants might be connected. The trial court instructed counsel that he should not use the word "gang," and that he would be stuck with the witness' answers. The prosecutor then asked Epps whether he knew four people from the 18th Street, S.E. area, whether he knew that one of them had been murdered, whether Epps used or sold drugs and whether he had ever been in a particular crack house. Epps said that he knew the four people and that one of them had been murdered. He denied using or selling drugs, although he admitted that his dogs were kept in a building that was used as a crack house. Appellants contend that this line of questioning unfairly smeared the reputation of Epps, a key defense witness, and caused the jury to speculate that they were members of a rival gang.

 "[T]he government may not attempt to manufacture evidence by creating an impression in the minds of the jurors through questions that imply the existence of facts." *Ali v. United States*, 520 A.2d 306, 313 (D.C.1987). Questions to a witness assuming a particular factual predicate "must be grounded in a good faith belief that those facts are susceptible to proof by competent evidence." *Id.* (citations omitted); *Harris v. United States*, 618 A.2d 140, 146 (D.C.1992). Even if denied, false insinuations may leave some prejudice in the jurors' minds. *Clayborne, supra*, 751 A.2d at 962–63 (citations omitted). Appellants argue that the government had no good faith basis for this line of questioning and that they were prejudiced by it.

The prosecutor proffered at trial that information that appellants and Epps were members of rival drug gangs competing for territory around 18th Street, S.E. resulted from months of investigation by the Metropolitan Police Department and the FBI. The trial court found this foundation adequate to permit some limited inquiry into this area, and we find no abuse of discretion in its ruling. Cross-examination is often exploratory because counsel can not always know what the opposing side's witness will say. *Clayborne, supra*, 751 A.2d at 963 (citing *Alford v. United States*, 282 U.S. 687, 692, 51 S.Ct. 218, 75 L.Ed. 624 (1931)). The foundational requirement is "fairly lenient." *Id.* (citing *Carter v. United States*, 614 A.2d 913, 919 (D.C. 1992)). Here, the proffer was sufficient for the court to determine that the prosecutor had a good faith basis for the inquiry.[10] *See id.* (citation omitted); *see also McGrier v. United States*, 597 A.2d 36, 44–45 (D.C.1991).

## IV.

 There remains appellants' alternate argument that the case should be remanded for an evidentiary hearing concerning the government's delay in producing *Brady/Giglio* material. Prior to trial, the defense requested *Brady* material.[11] The government opposed on the grounds that the defense sought impeachment material which was not *Brady* and that premature identification of the witnesses would place them in jeopardy. The day before trial, the prosecutor stated that it was his practice to disclose *Giglio* material at the time the jury was selected and

---

**10.** Even assuming error in allowing the questioning, it would not rise to the level of reversible error. The jury was instructed that the questions of counsel were not evidence, and the witness' answers were not harmful. That a citizen knows someone who was murdered does not in itself damage the citizen's reputa-

tion. The questioning bore on the witness, rather than appellants, which might have been more prejudicial.

**11.** *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

sworn, and the court approved this procedure.

■ The government is required to disclose evidence that tends to be favorable to the accused or evidence that affects the credibility of a government witness where material to guilt or punishment. *Brady, supra* note 7, 373 U.S. at 87, 83 S.Ct. 1194; *Giglio, supra*, 405 U.S. at 154–55, 92 S.Ct. 763. This obligation includes disclosure " 'at such a time as to allow the defense to use the favorable material effectively in the preparation and presentation of its case, even if satisfaction of this criterion requires pre-trial disclosure.' " *Edelen v. United States*, 627 A.2d 968, 970 (D.C.1993) (citations omitted); *accord Curry v. United States*, 658 A.2d 193, 197 (D.C.1995). Reversal will not be ordered on the grounds of failure to disclose under *Brady* "absent a further showing that 'disclosure of the suppressed evidence to competent counsel would have made a different result reasonably probable.' " *Farley v. United States*, 694 A.2d 887, 889 (D.C. 1997) (quoting *Kyles v. Whitley*, 514 U.S. 419, 441, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995)). "Reasonable probability," in this context, means " 'a probability sufficient to undermine confidence in the outcome.' " *Id.* (quoting *United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985)). The circumstances of this case do not meet that standard.

■ During cross-examination, the government's key witnesses, Pinckney and Brown, acknowledged receiving sums of money while in the witness protection program. Pinckney received close to $12,000 after he implicated Goode and Ebron in the crimes; and Ms. Brown received approximately $77,000. Appellants contend that the failure of the government to disclose the information sooner prevented them from investigating the circumstances more fully.[12] However, appellants have not demonstrated prejudice resulting from the delayed disclosure. *See Bellanger v. United States*, 548 A.2d 501, 503 (D.C.1988). Appellants did not object to the procedure when announced or request a delay of trial to investigate the matters further. *See id.* Moreover, they were able to use the information extensively in cross-examination to challenge the credibility of Pinckney and Brown. Appellants have not shown how the outcome would have been different if they had the information earlier. Further, we are not persuaded that a remand for further proceedings would materially affect the determination of the issues. Appellants were able to demonstrate the inconsistencies they cite to and to present to the jury the financial benefits that the witnesses obtained after implicating appellants and entering the witness protection program. Appellants have not shown how additional information on how the witnesses utilized the money obtained

---

**12.** Specifically, appellants contend that they could have investigated Ms. Brown's claim that she had other places to live, although she was being evicted at the time she implicated Ebron and Goode, and that she used some of the funds for her children's medical expenses. They also point to inconsistencies in the statements of Pinckney and Brown that could have been investigated further. As to Pinckney, they refer to the following inconsistencies: (1) telling the police that he obtained the key and opened the alley gate, but later saying that he obtained the key at the request of Goode and Ebron, who opened the gate themselves; (2) admitting to the grand jury that he implicated Ebron and Goode after a break-up with Ebron's sister, while denying later that they had broken up; and (3) denying at trial that he had smoked marijuana the day of the shooting, while saying earlier that he had smoked so much of it that he forgot faces. As to Brown's account, appellants cite her testimony that she had seen Ebron and Goode at the apartment after the shooting, while her grand jury testimony did not include such statements.

from the witness protection program would have aided their case. Therefore, we find no basis for a remand for further inquiry into the issue.[13]

For the foregoing reasons, we affirm the judgment of the trial court as to appellant Ebron,[14] and we reverse Goode's convictions and remand for a new trial.

*So ordered.*

---

13. We take this opportunity to reemphasize that prosecutors are expected "to resolve all reasonable uncertainty about the potential materiality of exculpatory evidence in favor of *prompt* disclosure ...." *Edelen, supra,* 627 A.2d at 971 (citation omitted) (emphasis added). When the government fails to make prompt disclosure, as required, the opportunity for use of the material by the defense may be impaired, and the administration of justice may be impeded by the necessity for a continuance to allow the defense to make use of the material or by the need for reversal of a conviction.

14. We find no basis for reversal because the trial court allowed the government: (1) to elicit from Epps that he did not report to the police Pinckney's alleged attempt to rob him; and (2) Epps' pending murder charge in an effort to show his bias against the government.