**Darnell DYSON, Appellant,**

v.

**UNITED STATES, Appellee.**

No. 02–CF–500.

District of Columbia Court of Appeals.

Argued March 9, 2004.

Decided May 6, 2004.

 

John R. Fisher, Roy W. McLeese III, Elisabeth S. Poteat, and Carolyn Becker, Assistant United States Attorneys, were on the brief, for appellee.

Before STEADMAN, REID and WASHINGTON, Associate Judges.

REID, Associate Judge:

After a jury trial, appellant Darnell Dyson was convicted of two counts of first-degree sexual abuse while armed, in violation of D.C.Code § 22–4102 (1996).[1] He filed a timely notice of appeal challenging (1) the trial court's jurisdiction over the charged crimes of which he was convicted; (2) the trial court's admission of certain testimony under the report of rape exception to the hearsay rule; and (3) the failure of the trial court to grant his motion for relief from prejudicial joinder of offenses. We hold that the trial court had territorial jurisdiction in this case because an element of first-degree sexual abuse, the use of force for the purpose of compelling sexual activity, occurred within the boundaries of the District of Columbia. In addition, we conclude that the trial court properly admitted the testimony of a hospital nurse under the report of rape hearsay exception, and did not abuse its discretion in permitting the joinder of offenses occurring on two different dates and involving different complainants but the same defendant.

## FACTUAL SUMMARY

The government presented evidence showing that on March 17, 2001, in the evening hours, Carnisha Allsbrook and Teka Thomas went to a liquor store located at 8th and H Streets, in the Northeast

Thomas L. Dybdahl, Public Defender Service, with whom James Klein and Sandra K. Levick, Public Defender Service, were on the brief, for appellant.

Tejpal S. Chawla, Assistant United States Attorney, with whom Roscoe C. Howard, Jr., United States Attorney, and

1. Recodified at D.C.Code § 22–3002 (2001). Mr. Dyson was sentenced to consecutive terms of 10 years on each count, followed by 5 years of supervised release. He was acquitted of 25 counts of the information filed against him, and the jury could not reach a decision on three of the counts.

quadrant of the District of Columbia, where they encountered two men, later identified as Mr. Dyson and Kenneth Roots. Because the store did not have the brand names the women requested, they accepted the offer of a ride to another store. The women climbed into a Mazda MPV van with the men; another man, later identified as Antawan Hamilton, was also present. Ms. Allsbrook directed the driver to another liquor store a few blocks away, at 11th and H Streets. After a short stop at Ms. Allsbrook's home at 20th and K Streets, N.E., the women returned to the van, began to drink orange juice and Remy VSOP, and talked about getting "some weed." The van moved towards 48th Street and Eastern Avenue and stopped near an apartment building, according to Ms. Allsbrook.[2] All of the passengers exited the van and went into the apartment building. There they initially listened to music, drank, and smoked marijuana.

Ms. Allsbrook and Mr. Roots moved to another room of the apartment. Ms. Allsbrook indicated her willingness to have sex with Mr. Roots so long as he used a condom. As events proceeded to unfold inside the apartment, the women became aware that the men were armed.

Eventually the three men and the women left the apartment and returned to the van. Ms. Allsbrook and Ms. Thomas were ordered to lie down on the back seats. Mr. Dyson drove the van. When Ms. Allsbrook lifted her head and pointed out that they were not going toward her home, Mr. Roots poured liquor on her. He had a gun in hand and ordered Ms. Allsbrook to move to the front of the van, and to have oral sex first with Mr. Dyson and then with him. Mr. Roots also "threatened to

kill [Ms. Allsbrook and Ms. Thomas] and bury them." Ms. Allsbrook complied with the order to perform oral sex on the men. After the sexual activity, the women were pushed out of the van separately. Ms. Allsbrook noticed that she was near the Pepsi Cola plant, located not far from the District border in Maryland, and found a gas station where she sought assistance. Police from Cheverly, Maryland arrived first, followed by officers from the District's Metropolitan Police Department. Ms. Allsbrook was taken to a police station in the District, where she recounted the events of the evening, and then she was transported to Howard University Hospital.

At Howard University Hospital, Julie Stuckey, a sexual assault nurse examiner ("SANE") met Ms. Allsbrook. At Mr. Dyson's trial Nurse Stuckey was asked in part: "[W]hat did [Ms. Allsbrook] say happened?" Nurse Stuckey replied:

> She got into the van [and was driven to the] 1300 block [of] Eastern [Avenue], Northeast, Washington. And while there at the residence suspect two, which is Mo [Mr. Dyson], said that he was going to go to the store to purchase condoms. When he came back, he kicked in the bedroom door and suspect one, which is Stretch [Mr. Roots], was vaginally assaulting [Ms. Allsbrook].

Nurse Stuckey also stated that Ms. Allsbrook recounted seeing Ms. Thomas "on her knees performing oral sex on ... [Mr. Roots while Mr. Dyson] was vaginally assaulting her from behind." When asked what Ms. Allsbrook had said about events in the van after she left the residence, Nurse Stuckey declared:

---

**2.** Other testimony from Mr. Hamilton and Mr. Dyson located the apartment building in

question in Southeast Washington.

While they were in the van, [Mr. Roots] also had the gun the whole time. Told the two girls to lay in the back of the van .... [Mr. Roots] told [Ms. Allsbrook] to come up and perform oral sex. And he had a gun to her head. He also had her perform oral sex on the driver, [Mr. Dyson] .... [T]hen [Mr. Roots] wants [Ms. Thomas] to come up from behind and perform oral sex on [Mr. Roots]. And to have [Ms. Allsbrook] do [Mr. Dyson]. And they do, again, with the threat of the gun .... [Mr. Roots] asked [Mr. Dyson] if he brought the shovel. And his words were, we've got to kill them.

Ms. Allsbrook also informed Nurse Stuckey that:

> [Mr. Roots] told [Mr. Dyson] to slow down so he can put [Ms. Thomas] out. The van slows down and [Mr. Dyson] pushes her out. The van moves about a mile further and by the Pepsi Cola company in Cheverly and [Ms. Allsbrook] is also pushed out by [Mr. Hamilton]. She said she had walked to a gas station there on [highway] 450 and she called the police.

When Nurse Stuckey examined Ms. Allsbrook with a special lamp, "her neck ... glowed [and] her inner thighs," signaling "either saliva or semen." However, Nurse Stuckey's "swabbings" and "blue dye" test revealed no "positive findings." [3] And further examination revealed "no tears, no bruises, no lacerations." In addition, the "toxicology screen" of Ms. Allsbrook's blood showed an alcohol, marijuana, and PCP content.

---

**3.** After Ms. Allsbrook and Ms. Thomas had been picked up in Cheverly, Maryland by District police and had given their statements to the police on the early morning of March 18, 2001, Detective Anita Schofield was assigned to take them to the Howard University Hospital for examination. Detective Schofield testi-

## ANALYSIS

### *The Jurisdictional Issue*

Mr. Dyson first contests the trial court's rulings and instructions to the jury regarding the District's territorial jurisdiction over the sexual assaults occurring in the van after the group left the apartment. The government generally supports the trial court's conclusions regarding the District's jurisdiction and argues that the trial transcript contains ample testimony which places the acts of sexual abuse in the District.

The trial court's analysis of the jurisdictional aspect of the case is reflected in its discussion with counsel and its consideration of Mr. Dyson's motion for judgment of acquittal at the close of all the evidence. After hearing defense counsel's theory regarding jurisdiction, and his emphasis on the government's "burden of proving jurisdiction beyond a reasonable doubt," a standard echoed by the prosecutor as well, *see Mitchell v. United States,* 569 A.2d 177 (D.C.1990), the trial judge reviewed pertinent case law pertaining to territorial jurisdiction and summarized his conclusions relating to that law prior to ruling on the defense motion:

> [I]t is presumed that the offense charged was committed within the jurisdiction of the court in which the charge is filed, unless the evidence affirmatively shows otherwise[.][T]he crime may be a single act and immediate in all of its consequences .... On the other hand, the crime may be the result of a series of acts or a result of a single act and the direct consequences may be made to

---

fied that because the women were hungry, she "stopped at McDonalds and [she] bought them breakfast." Later, she "found out that potential evidence would have been destroyed by them ... eating or drinking anything before their examination by the SANE nurse."

occur in various times and in different localities. In that instance, the criminal act and the cause and effect are part of a complete transaction. Wherever any part is done[,] that becomes the locality of the crime as much as where it may have culminated.

In this case I think it really is a classic situation that it is a continuing, ongoing offense. The court has concluded, under the circumstances regarding the kidnapping, that the women were kidnaped for in part the purpose of committing sex acts on them, as—at least from the government's viewpoint, that's exactly what happened.

The cases also make clear that this is a jurisdictional question of law and not one ... that should be submitted for the jury's consideration.

Having distilled the legal principles from the case law, and reflecting the government's undisputed burden to demonstrate the District's jurisdiction beyond a reasonable doubt, the trial judge proceeded to explain his reasons for denying Mr. Dyson's motion for judgment of acquittal on jurisdictional grounds:

The Court concludes beyond a reasonable doubt that the facts set forth in this case indicate an ongoing crime or series of crimes which ultimately ended in Maryland. And the Court notes parenthetically that it is also not crystal clear to me at all that these crimes didn't occur in the District ... [T]here is only a short period of time in terms of distance, I believe a mile, from the Pepsi Cola plant where they were subsequently let off. And the facts, as I understand them, although clearly not very precise on this particular point, do not unmistakably show that they took place in Maryland at all. Indeed, the weight of the evidence is that they probably took place in the District .... [T]he standard the Court has to apply is whether or not these are a series of ongoing offenses and, therefore, the Court's jurisdiction is properly exercised in having these counts filed and prosecuted in this court.

Thus, the trial court's view of the jurisdictional question centered on its conclusion that the first-degree sexual offense charged against Mr. Dyson was part of an ongoing crime that began, at the latest, when Ms. Allsbrook and Ms. Thomas were forced to lie down on the back seat upon entering the van, and the force continued thereafter. This view is in contrast to the defense counsel's trial view of the jurisdictional issue—that the sexual activity in the van did not occur until the van was in Maryland. Indeed, defense counsel appeared to concede that if the offense is regarded as an ongoing one, the District has territorial jurisdiction.[4]

■ We conclude that the trial court's contextual view of the case as an ongoing

4. During its discussion of the jurisdictional issue, Mr. Dyson's counsel said to the trial judge in part:

I understand the Court's ruling on kidnapping. That occurs after they get out of the apartment and [are] told to lie down, that sort of thing. So I guess I won't belabor that argument. Because that would be, given the Court's ruling, kind of an ongoing offense, if the Court says that it happened basically once they got in the van after getting out of the apartment. So there it occurs in [the District] and then they end up in Maryland. That kind of context there is an ongoing offense argument, which we don't dispute.

But when the evidence is that the sexual activity does not occur until they turned off of Eastern Avenue and ... into Maryland [b]ecause Eastern Avenue is on the border between the two jurisdictions [-][t]here is no ongoing offense. There is no ongoing offense analysis that needs to be applied. Those acts occurred in Maryland. At least there's a reasonable doubt that they occurred in Maryland.

offense was proper as was its application of correct jurisdictional legal principles. As we made clear in *Adair v. United States,* 391 A.2d 288 (D.C.1978), "the question of jurisdiction is not one of fact for the jury." *Id.* at 290 (citing *United States v. Berrigan,* 482 F.2d 171 (3d Cir.1973)); *see also Mitchell v. United States,* 569 A.2d 177, 180 (D.C.1990). Hence, the jurisdictional question, involving the application of law to the trial court's factual findings, is a legal issue which we review *de novo.* *See District of Columbia v. Stokes,* 785 A.2d 666, 670 (D.C.2001). We begin with the presumption, as did the trial court, "that an offense charged was committed within the jurisdiction of the court in which the charge is filed unless the evidence affirmatively shows otherwise." *Adair, supra,* 391 A.2d at 290 (citation omitted). But we also are mindful that "the Superior court [of the District of Columbia] has jurisdiction of any criminal case under any law applicable exclusively to the District of Columbia." D.C.Code § 11–923(b)(1) (2001). In that regard it is insufficient to show that part of the crime in question took place outside the District's boundaries since "a crime may be the result of a series of acts ... [and][t]he direct consequences may be made to occur at various times and in different localities." *Adair, supra,* 391 A.2d at 290 (citation and internal quotation marks omitted).

■ In this case, the trial court determined that Mr. Dyson engaged in "an ongoing crime or series of crimes which ultimately ended in Maryland." Its conclusion was drawn after the court heard the government's theory as to the District's jurisdiction. Prior to the trial court's ruling denying Mr. Dyson's motion for judgment of acquittal, the prosecutor stated in part:

With regard to this issue about proof of jurisdiction beyond a reasonable doubt, I think the *Adair* case makes clear that's an issue that should not necessarily go before the jury. The jurisdiction is a question of law more properly addressed by the Court .... [T]he government's position is that when these women were taken into the van, clearly the kidnapping had begun. They were under gunpoint. They were told to lay down in the back of the van.

The defense is stating that it's their position that the sex occurred once the van had traveled to Maryland .... I think it's a question that, ... as an ongoing enterprise, it's not even an issue the Court really needs to consider because of the elements of the kidnapping and then the sex continuing on in the van. Regardless of whether or not they crossed the line I do believe that's the context of all of these cases ....

In stating its conclusions on the jurisdictional issue, it is significant that the trial court began with its theory of an ongoing offense. That ongoing offense commenced with the use of force to get Ms. Allsbrook and Ms. Thomas into a prone position on the back seats. D.C.Code § 22–3002 specifies that a person is guilty of first-degree sexual abuse "if [he] engages in or causes another person to engage in or submit to a sexual act ... (1)[b]y using force against that other person; [or] (2)[b]y threatening or placing that other person in reasonable fear that any person will be subjected to death, bodily injury, or kidnapping." Force is an element of first-degree sexual abuse. Ms. Allsbrook was subjected to force when she was ordered into a prone position on a back seat of the van upon exiting the apartment where other sexual activity had taken place and where she learned that Mr. Roots had a gun. This act of force clearly occurred in the District. In addition, soon after she entered the van and assumed the prone position upon or-

der, liquor was poured on her when she raised her head and remarked that the van was not moving in the direction of her home. Whether or not the actual sexual abuse acts occurred in the District or in Maryland, when Ms. Allsbrook was instructed to move to the front of the van, noticed Mr. Roots had a gun, and heard his threat, that "we [are] going to kill [Ms. Allsbrook and Ms. Thomas] and bury them," is of no moment, so long as it is clear that the force element of the crime of sexual abuse began within the District beyond a reasonable doubt.[5] This was the thrust of the trial court's ruling on Mr. Dyson's motion for judgment of acquittal.

Just as the threat in *Adair* occurred in the District, so too, the use of force and threat in the instant case took place in the District. Thus, as we recognized the existence of jurisdiction in *Adair*, we hold here that the trial court had territorial jurisdiction because an element of first-degree sexual abuse, the use of force for the purpose of compelling sexual activity, occurred within the boundaries of the District of Columbia. *Adair, supra*, 391 A.2d at 290; *see also United States v. Baish*, 460 A.2d 38, 40 (D.C.1983) ("Where [the criminal act] serves as one of several constituent elements to the complete offense, we have found jurisdiction to prosecute in the Superior Court, even though the remaining elements occurred outside of the District.") (citing *Adair, supra*, 391 A.2d at [290]; other citations omitted).[6]

---

**5.** We also agree with the trial court that "the facts, ... although not very precise ... do not unmistak[ab]ly show that they took place in Maryland at all. Indeed the weight of the evidence is that they probably took place in the District." If the jury believed the testimony of Mr. Hamilton and Mr. Dyson that the apartment at which some of the activity took place was located on 13th Street in the Southeast quadrant of the District, rather than on Eastern Avenue; and if the jury further credited the testimony of Detective Shields that, based on search warrants, she searched two apartments in a building located in the 1300 block of Eastern Avenue and neither fit the description given by the victims as to the number of rooms and layout of the apartment where the sexual assaults had taken place, then reasonable inferences could be drawn. One such inference is that given the time required to move from 13th Street in Southeast Washington to Maryland, just across the Eastern Avenue border, the sexual activity in the van had to have occurred in the District. Another reasonable inference is that Ms. Allsbrook and Ms. Thomas were mistaken about where the apartment in question was located. In that regard, it should be noted that Detective James Broadbent testified that he picked up [Ms. Allsbrook and Ms. Thomas] in Cheverly, Maryland sometime in the early morning hours of March 18, 2001. As he was driving toward the Sixth District police station in the District, he told the women that "if they saw ... the apartment building where the rape

had occurred, to point it out to [him]." When they were in the 1300 block of Eastern Avenue, one of the women pointed to an apartment building, particularly a wooden fence and a dumpster at the building. The other woman "seemed unsure ... [and] never said it was or wasn't" the building where the sexual assaults had taken place.

In any event, the fact that, for reasons we cannot know with certainty, the jury acquitted appellant on the kidnapping charge does not negate reliance on the act of force occurring in the District.

**6.** Mr. Dyson urges us to follow the lead of Maryland in *West v. State*, 369 Md. 150, 797 A.2d 1278 (2002). There a carjacking and abduction of a woman took place in Maryland, followed by sexual offenses against the woman in the District of Columbia. The Court of Appeals of Maryland "h[e]ld that, since the sexual conduct occurred in the District of Columbia, the State of Maryland did not have territorial jurisdiction to prosecute [the perpetrator] for first degree rape and first degree sexual offense." *Id.* at 1279–80. We note first that in *West*, "[u]nder ... the agreed 'Statement of Facts' contained in the briefs filed [by the parties in the Maryland court], the force, lack of consent, and display of the handgun associated with the rape and first degree sexual offense took place entirely in the District of Columbia." *Id.* at 1285. Furthermore, even if we were so inclined, we are

### The Admission of Nurse Stuckey's Testimony

Mr. Dyson contends that "[n]one of [Nurse Stuckey's testimony] should have been admitted under the [report of rape exception to the hearsay rule], and allowing the jury to hear and consider this highly prejudicial bolstering of Ms. Allsbrook's story was reversible error." The government argues that "the trial court did not abuse its discretion by allowing this testimony under the rape-report and medical-diagnosis exceptions to the hearsay rule, and even if erroneously admitted, [Mr. Dyson] was not prejudiced."

As we have stated previously, "[a] decision on the admissibility of evidence, of course, is committed to the sound discretion of the trial court, and we will not disturb its ruling absent an abuse of discretion." *Smith v. United States*, 665 A.2d 962, 967 (D.C.1995) (citations omitted). Whether or not a particular hearsay exception applies to certain statements is a question of law which we review *de novo*. *See Brown v. United States*, 840 A.2d 82, 88 (D.C.2004). The report of rape hearsay exception allows a witness to " 'testify that the complainant stated that a sexual crime occurred and [to] relate the detail necessary to identify the crime.' " *Velasquez v. United States*, 801 A.2d 72, 82 (D.C.2002) (quoting *Galindo v. United States*, 630 A.2d 202, 209 (D.C.1993)).

Towards the beginning of Nurse Stuckey's testimony about what Ms. Allsbrook told her during her examination at Howard University Hospital, defense counsel objected to the government's question about the third person [presumably Mr. Hamilton] who did not participate in the actual sexual assaults, and the trial judge called a bench conference. During that conference, the trial court mentioned both the medical diagnosis and the report of rape hearsay exceptions and stated in part: "To place the relationship of the three individuals in just some basic facts, not detailed fact, some basic facts as to what the individual actors did or did not do seems to me to fall within that part of the [report of rape] rule. So I'll permit it over objection." The prosecutor offered the trial court the report Nurse Stuckey compiled while Ms. Allsbrook was at the Howard University Hospital, and which she would use to recount what Ms. Allsbrook told her during her examination. After reviewing the report the trial judge declared:

> It does seem to me this really is bare bone's facts. This is not excessively detailed. It seems to me it does place the entire incident in context in terms of . . . the report of rape. Some of it . . . goes to medical diagnosis as well in terms of the actual assaultive conduct. But it seems to me it's not so detailed to go beyond the purview of the purposes of the report[ ][of] rape law.

In examining the purposes or rationale of the report of rape hearsay exception, we have said that the exception is designed: "(1) to negate the assumption that if there is no such evidence, no complaint was made; (2) to show that the victim behaved as is expected traditionally, i.e. by making a prompt report; and (3) to rebut the claim of recent fabrication." *Velasquez, supra*, 801 A.2d at 82 (citing *Battle v. United States*, 630 A.2d 211, 217 (D.C. 1993)); *see also Williams v. United States*, 756 A.2d 380, 385–86 (D.C.2000).

not free to adopt the Maryland rule that the crime "may be prosecuted only in a jurisdiction where the essential or key element takes place [a forced sexual act in this case]," *id.* at 1283, since such a ruling would disregard another panel's decision. *See M.A.P. v. Ryan*, 285 A.2d 310 (D.C.1971).

Based upon our review of the record and transcripts in this case, we are satisfied that the trial court did not abuse its discretion in admitting, under the report of rape hearsay exception, the testimony of Nurse Stuckey concerning what Ms. Allsbrook told her at Howard University Hospital during her examination. Since the defense emphasized that Ms. Allsbrook did not mention sexual assaults in her 911 call to the police after she was forced out of the van, the trial court's decision to admit the testimony was consistent with the purposes of the report of rape exception in that it at least negated any juror assumption that no complaint of sexual abuse was made, and refuted the implicit defense accusation of recent fabrication. In addition, Ms. Allsbrook recounted the sexual assaults to the first health professional she encountered as soon as she completed her interview with the police, thus showing that as a victim of sexual abuse, Ms. Allsbrook acted in a manner society would expect by promptly reporting the abuse to a health professional. Furthermore, we see no reason to disturb the trial court's conclusion that only bare, non-detailed facts were admitted through Nurse Stuckey which placed the sexual abuse in context. Nurse Stuckey related minimal facts about the participants, the force used and the sexual abuse at the apartment, as well as in the van. Under the circumstances, then, the trial court did not abuse its discretion in admitting Nurse Stuckey's testimony under the report of rape hearsay exception.

### The Severance Issue

Mr. Dyson claims prejudicial error by the trial court due to its failure to sever the count regarding a March 15 sexual assault with another complainant from the March 17 sexual assault in which Ms. Allsbrook and Ms. Thomas were involved. The government argues, in part, that the trial court did not abuse its discretion in ruling that "the charged sexual abuse offenses were mutually admissible." The government further maintains that "evidence of one sexual assault may be admitted to rebut the defense of consent to a charge of sexually assaulting a different victim in similar circumstances not remote in time"; and that "a defendant's intent to sexually abuse the victim at the time of a charged offense can be inferred from prior incidents in which the defendant sexually abused that same victim."

"A motion for severance on the ground of prejudicial joinder is committed to the sound discretion of the trial court." *Bright v. United States,* 698 A.2d 450, 454 (D.C.1997). Furthermore,

When joinder is based on the similar character of the offenses, a motion to sever should be granted unless (1) the evidence as to each offense is separate and distinct, and thus unlikely to be amalgamated in the jury's mind into a single inculpatory mass, or (2) the evidence of each of the joined crimes would be admissible at the separate trial of the others.

*Id.* And, we begin with "a presumption favoring joinder of trials." *Bittle v. United States,* 410 A.2d 1383, 1386 (D.C.1980) (citation omitted). "In deciding whether to sever, the trial judge must balance the possibility of prejudice to the defendants against the legitimate probative force of the evidence and the interest in judicial economy." *Id.* (citing *Crisafi v. United States,* 383 A.2d 1 (D.C.1978) (other citations omitted)). Moreover, the "doctrine [of mutual admissibility] recognizes that the joinder for trial of two crimes does not unduly increase the likelihood that the jury will infer a criminal disposition when the rules of evidence would have permitted the admission of evidence of each crime at the

separate trial of the other." *Cox v. United States,* 498 A.2d 231, 237 (D.C.1985) (citing *Drew v. United States,* 118 U.S.App. D.C. 11, 16, 331 F.2d 85, 90 (1964)).

■ In this case, there were two separate incidents of alleged sexual abuse involving different complainants. The first took place on March 15 in the Northeast quadrant of the District and the complainant was Ms. Letitia Boddie. The government's evidence sought to show the following. Mr. Dyson was driving his Mazda MPV van when he saw her on the street. Several days later he telephoned her and arranged to pick her up in his van. Another man was present in the van. When Ms. Boddie fell asleep, she alleged that she was awakened by the feel of "an object running up and down [her] leg." Although Ms. Boddie spurned the second man's sexual advances, she alleged that he forced her to have oral sex with him and Mr. Dyson at the point of a gun, and then vaginal sex with him. Ms. Boddie managed to escape from the van, called the police, and was taken to Howard University Hospital where she, too, was examined by Nurse Stuckey.

The trial court denied Mr. Dyson's motion to sever counts, concluding that evidence relating to the March 15 and 17 incidents would be mutually admissible at separate trials. At the time the court made this ruling, Mr. Dyson had announced a consent defense with respect to both incidents. During trial, he maintained a consent defense with respect to the March 15 incident, but posited "a complete denial regarding some of the sexual acts pertaining to Mr. Roots regarding Ms. Boddie and presented an innocent presence defense with [respect to] other conduct of Mr. Roots for acts that took place both in the apartment and in the van regarding Ms. Allsbrook and Ms. Thomas." After the case had been submitted to the jury, the trial court put on the record extensive conclusions as to why it had denied the defense motion to sever counts. In essence the court's rationale was based on similarities between the March 15 and 17 incidents, and the proper use of these sexual contacts to show Mr. Dyson's identity and motive.[7] The court also examined the use of "other crimes" evidence and concluded that: (1) "there is clear and convincing evidence that Mr. Dyson committed these various crimes"; (2) "in light of his innocent presence and his consent defense, ... the evidence of these other crimes goes and went to a genuine material issue in this case"; (3) "the defendant's intent to have sexual contact or commit sexual acts against the complainants without their consent is logically relevant to a

---

7. The trial court stated in part:

[T]he Court notes that there were ... many similarities in these events .... [A]lthough we now know the alleged [sexual abuse contacts] that took place in the apartment were in Southeast not Northeast, a lot of the action dealing with the March 17, 18 events took place within a five-block radius of the March 15th events. In both instances, both Mr. Roots and Dyson ... were the only individuals having sexual contact with the victims. They used the same van. Circumstantially the same imitation pistol was used. In both instances the defendants lulled ... the victims into believing that they were just going out for a ... social date .... Sex was forced at gunpoint. There was sex in the van .... Manifestly to show the identity of the two individuals who did these acts, ... the fact of these strong similarities ... would have shown under the analysis of identity that there was a reasonable probability that the same two individuals committed the same acts ....

Some ... cases ... talk in terms of motive. But the heart of these cases go[es] to the fact that when the issue of consent is at issue, the defendant[']s intent to ... have sexual intercourse or sexual contact with the victim without her consent is a key issue that the defendant has placed into the record.

genuine issue, a specific issue other than its tendency to show general criminal propensity"; and (4) "the strong probative value of this evidence is not substantially outweighed by the risk of unfair prejudice to the defendant in the sense of bringing forth matters that will distract the jury from its job [or] . . . bring unduly emotional issues in the jury."

Based upon our review of the record, we agree with the trial court that there were similarities between the March 15 and March 17/18 incidents. The same Mazda MPV vehicle was used in both instances. Mr. Dyson made a friendly approach to the women, followed by the use of force both times. Both Mr. Roots and Mr. Dyson were identified as present at the March 15 and March 17/18 incidents, part of which took place in the same geographical area. And, based on circumstantial evidence, the same pistol was displayed on both occasions. Consequently, on this record, we cannot say that the trial court abused its discretion by admitting evidence of both incidents where the identity of the defendants initially was at issue and where the defendants' intent to have sexual contact was relevant to the issue of consent. *See Crisafi v. United States*, 383 A.2d 1, 4 (D.C.), *cert. denied*, 439 U.S. 931, 99 S.Ct. 322, 58 L.Ed.2d 326 (1978) (affirming denial of motion to sever where the "unusual factual similarities" of two offenses, rape and assault with intent to rape, on different victims made the assault evidence admissible to show motive and identity in the rape case because a consent defense was raised). This is particularly true where the trial court took care to avoid use of one incident to show propensity to commit the other, and where the trial court engaged in the proper inquiries under *Drew, supra. See Cox, supra*, 498 A.2d at 237 ("joinder for trial of two crimes does not unduly increase the likelihood that the jury will infer a criminal disposition when the rules

of evidence would have permitted the admission of evidence of each crime at the separate trial of the other"); *Bittle, supra*, 410 A.2d at 1386 (trial court properly "balance[d] the possibility of prejudice to the defendants against the legitimate probative force of the evidence and the interest in judicial economy"); *Crisafi, supra*, 383 A.2d at 5 (evidence of each crime admissible to show motive where consent is at issue).

Accordingly, for the foregoing reasons, we affirm the judgment of the trial court.

*So ordered.*