**Michael D. BLACKSON, Appellant,**

v.

**UNITED STATES, Appellee.**

**No. 06–CF–1494.**

District of Columbia Court of Appeals.

Argued May 5, 2009.
Decided Aug. 20, 2009.

Alice Wang, Public Defender Service, with whom James Klein, and Samia Fam, were on the brief, for appellant.

John P. Gidez, Assistant United States Attorney, with whom Jeffrey A. Taylor, United States Attorney at the time the brief was filed, and Roy W. McLeese III, Thomas J. Tourish, Jr., and Michelle D. Jackson, Assistant United States Attorneys, were on the brief, for appellee.

Before REID, KRAMER and OBERLY, Associate Judges.

KRAMER, Associate Judge:

Shortly after 2:00 a.m. on April 24, 2005, appellant Michael Blackson shot and killed Lavelle Jones. This fact was undisputed at trial. The sole issue was whether the shooting was a "revenge killing," as theorized by the government, or a self-defense shooting, as asserted by the defense. The jury convicted Blackson of second-degree murder while armed, possession of a firearm during a crime of violence ("PFCV"), and carrying a pistol without a license ("CPWL").[1] Blackson argues on appeal that his convictions should be reversed because the trial court erred by admitting certain statements as adoptive admissions

---

1. Blackson was sentenced to 24 years for the second-degree murder charge, 7 years for PFCV, and 2 years for CPWL (for an aggregate term of 33 years' imprisonment), to be followed by five years of supervised release.

and by erroneously refusing to admit certain statements as proof of state of mind. He also contends that the trial court abused its discretion by allowing a government witness to testify that he was nervous about testifying because "snitches" were "not well liked" and revealing, in the absence of evidence that Blackson was responsible for the threat, that someone had threatened to kill him for "snitching." We disagree and affirm.

## I. Facts

In the early morning hours of April 24, 2005, two groups of young people went to a go-go club called the Mad Chef Café in Capitol Heights, Maryland. One group (of which Blackson was a part) came from the Sursum Corda neighborhood in Northwest Washington. The other group (of which Lavelle Jones was a part) came from the Butler Gardens neighborhood in Southeast Washington. The Sursum Corda group traveled in two vehicles—a burgundy Kia and a blue Honda. The Butler Gardens group also traveled in two vehicles—a green van and a black Pontiac. At the club, a fight broke out between the two groups, and both groups were kicked out. The fight continued into the parking lot, where it was broken up by officers from the Prince George's County Police Department. The groups were directed to get into their cars and leave.

The black Pontiac from Butler Gardens was the first to drive away. Lavelle Jones, the decedent, was in the Pontiac's front passenger seat. Next the green van from Butler Gardens pulled out of the lot and pulled off to the side of the road, idling across the street from the club while waiting for the Sursum Corda cars (the burgundy Kia and blue Honda). Mean-while, the black Pontiac had pulled into a nearby parking lot to wait for the green van.

When the Sursum Corda cars departed, the green van took off after them, and the black Pontiac took off after the green van, trying to catch up. Someone in the green van started shooting at the Sursum Corda cars and someone from Sursum Corda returned fire. The burgundy Kia from Sursum Corda turned onto a side road while the green van continued ahead. At this point, the driver of the black Pontiac from Butler Gardens stopped following the green van and headed toward his grandmother's house. Shortly after that, however, the green van crashed at the intersection of East Capitol Street and 53rd Street Northeast, at which point the van's occupants scattered to avoid the police.

One of the passengers from the green van called the driver of the black Pontiac, asking to be picked up. The driver did so, and the caller got in the backseat of the Pontiac behind the driver. Lavelle Jones was still in the front passenger seat of the Pontiac. The Pontiac continued down East Capitol Street, eventually stopping at a traffic light at the intersection of Minnesota Avenue and B Street, Southeast.

Meanwhile, the burgundy Kia from Sursum Corda came from the side road it had turned down and also ended up on Minnesota Avenue. Derron McGee, the driver of the burgundy Kia, noticed the black Pontiac ahead of them at a stop light and identified it as being one of the cars from Butler Gardens. McGee drove the Kia around the left side of the Pontiac. As he did so, Blackson fired a shot into the black Pontiac. The bullet hit Lavelle Jones in the head, killing him.[2]

---

2. After the shooting, the driver of the black Pontiac unsuccessfully tried to flag down a police officer and ended up driving to his grandmother's house, where someone called 911. Medical personnel arrived, but Lavelle Jones was already dead.

At trial, Blackson testified that as the burgundy Kia approached the black Pontiac, he fired the gun once because he "was scared for [his] life" when he saw the rear driver's side window of the Pontiac roll down and saw someone in the backseat pointing "what looked like a gun at [him]." At the grand jury, however, the driver of the Kia, McGee, had testified that when he asked Blackson why he had fired the shot, Blackson told him that "[he] had to do what [he] had to do because" the boys in the van "had shot at [them] . . . so [he] had to get them back," but that McGee shouldn't "worry about nothing" because "if anything happens, then it's all going to come back on him," that is, on Blackson. McGee was impeached with this testimony at trial after he denied that Blackson said anything after firing the shot.

Michael Yeager, Blackson's friend and a passenger in the blue Honda (who did not witness the shooting), also provided trial testimony that differed from his grand jury testimony. Before the grand jury, Yeager had testified that the day after the shooting he had overheard Blackson and three other people (two of whom were passengers in the Kia during the shooting and one of whom had been in the blue Honda) talking about the shooting while standing around behind his house. Yeager testified that Blackson and the individual from the blue Honda were talking and that in their conversation they described the events leading up to the shooting and the shooting itself. They said that "[t]hey seen . . . the guy that was shooting out of

the green van transfer . . . cars [and][t]hey followed the car. . . . They pulled up at a stop sign, pointed the gun out the window, but didn't fire. . . . They got right directly behind them, pulled alongside of them. [Blackson] cocked the gun back, [but] a bullet fell in [McGee's] lap" because Blackson didn't know "a bullet was [already] in the chamber" and "so a bullet ejected." Blackson then successfully "fired the gun. After the first fire, the gun-he tried to, I guess, fire again. It jammed, and [McGee] drove off." Upon questioning at the grand jury, Yeager clarified that it was Blackson who "pointed [the] gun at the Pontiac," and who "knew that someone was shot" because the shot "hit the window, and the dude just fell over," and that during the course of this conversation that Yeager was listening to, Blackson never denied any of these statements. At trial, however, Yeager testified that, although he saw Blackson and the Honda passenger talking, he was unable to hear what they were talking about, and that "everybody" was talking about the shooting, not just those two.[3] The trial court admitted Yeager's grand jury testimony as an adoptive admission by Blackson over his objection.

The trial court also permitted the prosecutor to question Yeager on-redirect about his reluctance to testify. Specifically, the prosecutor elicited testimony that Yeager was afraid of being considered a snitch; that he had been called a snitch in regards to this case; that snitches are "disliked" in his community; that his life had been threatened by unfamiliar people;[4] and

---

**3.** At trial, Yeager also denied that he ever saw Blackson with a gun and was impeached with his grand jury testimony that he saw Blackson put a gun in the burgundy Kia's glove compartment before they went to the club.

**4.** The colloquy regarding those making the threats went as follows:

Q: Mr. Yeager, have you been threatened because, have you been threatened because you came forward in this case.
A: Somewhat.
Q: You said somewhat. Tell us what was said or done to you.
A: Wasn't nothing never done. It was just people knowing.

that he "didn't want to come" to testify when subpoenaed. After the prosecution finished this line of questioning, the trial court gave a limiting instruction to the jury. That instruction, which was crafted with assistance and approval of Blackson's counsel stated as follows:

> The Court allowed testimony about snitches and prior threats for purposes of your considering Mr. Yeager's testimony here in court, [his] credibility and believability here in court. Not as any evidence that [Blackson] had threatened a witness or any evidence that [Blackson] had any third party threaten [Yeager]. So you are instructed to consider it only on the issues of credibility and not on issues, any issues, you cannot consider it any way as any evidence that [Blackson] threatened [Yeager] or caused anyone to threaten [Yeager].

Finally, the trial court rejected Blackson's request to admit testimony from a passenger in the burgundy Kia that (a) no one told the Kia's driver, McGee, to "follow that car," and that (b) McGee had said that he was "going to fly right past" the black Pontiac. Blackson argued that both of these statements should be admitted as state of mind hearsay exceptions and that they were relevant because the fact that no one told the driver to "follow that car" and the fact that McGee intended to "fly right past" the black Pontiac countered the government's theory that McGee purposefully slowed down to facilitate a deliberate shooting. The trial court sustained the prosecutor's objections on the grounds that the first statement did not "go to state of mind" and that the second state-

ment was inappropriately "trying to establish somebody else's intent through what the witness said."

## II. Adoptive Admissions

■ Blackson argues that the trial court erred in admitting Yeager's grand jury testimony as an adoptive admission because there was insufficient evidence that Blackson heard and "unambiguously assented" to the statements related by Yeager. We disagree.

■ The trial court's decision to admit or exclude evidence is reviewed only for abuse of discretion. *Goines v. United States*, 905 A.2d 795, 799 (D.C.2006); *Mercer v. United States*, 724 A.2d 1176, 1182 (D.C.1999). "[T]he exercise of that discretion must 'be founded upon correct legal principles.' It is an abuse of discretion if the trial judge rests [his or] her 'conclusions on incorrect legal standards.'" *Bell v. United States*, 801 A.2d 117, 125 (D.C. 2002) (citations omitted). Thus, "[w]hether or not a particular hearsay exception applies to certain statements is a question of law which we review *de novo*." *Dyson v. United States*, 848 A.2d 603, 611 (D.C. 2004).

■ A defendant may make an admission "by adopting or acquiescing in the statement of another." *Harris v. United States*, 834 A.2d 106, 116 (D.C.2003); *Robinson v. United States*, 606 A.2d 1368, 1371 (D.C.1992) ("When a defendant clearly adopts the statement of another that is inconsistent with the defendant's position at trial, that statement is admissible against the defendant as an adoptive ad-

Q: And what did they say out of their mouth?
A: Like they would kill me or something like that.
Q: And these people who say that they will kill you, where do they live?
A: I'm not sure.

Q: When I say that, do you know what neighborhood they're from?
A: No.
Q: How often do you see these people who said that they will kill you.
A: I don't.

mission."). The statement need not be explicitly adopted; rather, "all that is necessary is some manifestation of a party's intent to adopt another's statements, or evidence of the party's belief in the truth of the statements." *Harris, supra*, 834 A.2d at 117 (internal quotation marks and citations omitted). That is, "[w]hether the defendant acquiesced in the statement can ... be shown by the context of the conversation and the surrounding circumstances." *Brown v. United States*, 464 A.2d 120, 124 (D.C.1983). Thus, "[w]hen a statement is made in the presence of a party containing assertions of fact which, if untrue, the party would under all the circumstances naturally be expected to deny, failure to speak has traditionally been received as an admission," *Comford v. United States*, 947 A.2d 1181, 1185 (D.C.2008) (quoting 2 MCCORMICK ON EVIDENCE § 262 (6th ed. 2006)), so long as "the statement [was] made in the defendant's presence and hearing, and the defendant ... actually underst[ood] what was said and [had] an opportunity to deny it." *Foreman v. United States*, 792 A.2d 1043, 1052 (D.C.2002).

 When deciding whether to admit an adopted statement—

> the judge must make a preliminary determination whether a jury could reasonably conclude that the defendant unambiguously adopted another person's incriminating statement. If the judge answers that question in the affirmative and admits the evidence, then the jury's function is to decide whether it *should* reach the conclusion which the judge has held that it *may* reach, namely that there was unambiguous assent.

*Holmes v. United States*, 580 A.2d 1259, 1264 n. 8 (D.C.1990) (citing *Brown, supra*, 464 A.2d at 124). Accordingly, as a matter of law, "a purported adoptive admission should be admitted into evidence only if a jury could reasonably find that there was unambiguous assent to the statement of another." *Id.* at 1263, 1264 n. 8; *Comford, supra*, 947 A.2d at 1185.

Both parties briefed the trial court on the issue before it rendered its decision. The government provided the court with a bench memo and Blackson's counsel replied by email. The court considered both submissions, as well as the cases cited therein, over the weekend before announcing on Monday that it felt "prepared to resolve the issue." Although the court offered to "hear any further argument that either side wants to make," both parties stood by their submissions.

In reaching its decision, the trial court noted that Yeager's grand jury testimony, which described the speakers in the plural "they," did not distinguish between which statements were made by Blackson and which statements were made by the passenger with whom Blackson was speaking.[5] The trial court found, however, that "given the circumstances of them having a conversation about this incident very close in time, the conversation is not among enemies or among anyone involving a government agent or law enforcement person," Yeager's grand jury testimony "clearly puts [Blackson] in a position where you would expect that if things didn't occur the way they were describing them he would have said something." The trial court also noted that what Blackson and the passenger "said about what happened is clearly inconsistent, in the Court's view, [with

---

**5.** Yeager related to the grand jury the story of what happened after the green van crashed in response to the question "And what did they say happened then?" After Yeager finished relating the story of the shooting, which pri-

marily used the word "they" to describe the speakers, the prosecutor then asked "Who was the person who was doing this talking?" and Yeager replied "Michael Blackson and [a passenger in the blue Honda]."

what] the defense has been at trial," a fact which supported admission under *Brown* and *Robinson*, both of which note that "a 'failure to object or deny a codefendant's statements at the time they were made is especially probative of the defendant's acquiescence if they are made in the presence of a third party who was not an accomplice in the crime.'" *Robinson, supra*, 606 A.2d 1368; *Brown, supra*, 464 A.2d at 124.

Blackson argues that the trial court's ruling "was legal error, for the evidence at trial was insufficient as a matter of law to 'clearly' prove that [he] heard, understood, and 'unambiguously assented' to all of the statements with his silence," especially in light of Yeager's trial testimony that the five people in the back yard were "walking off, walking back, walking off walking back" during the conversation (a conversation which, moreover, Yeager claimed at trial never to have heard in the first place). Blackson, however, misapprehends the law. There was no need for the evidence "to 'clearly' prove that [Blackson] heard, understood, and 'unambiguously assented' to all of the statements with his silence" in order to be admissible; rather, such statements are admissible as adoptive admissions so long as there is sufficient evidence from which a jury *could* reasonably conclude that "the defendant unambiguously adopted another person's incriminating statement." *Holmes, supra*, 580 A.2d at 1264 n. 8.

We agree with the trial court that there was sufficient evidence from which the jury *could* reasonably draw that conclusion, whether or not we might have reached the same conclusion. Yeager's grand jury testimony, if believed, (1) placed Blackson at the conversation;[6] (2) established that the conversation involved statements that were inconsistent with what was being argued by him at trial (in that it made no mention of the need for self-defense or of seeing the black Pontiac's window roll down or any gun-like item pointing at the burgundy Kia or its passengers); and (3) established that he did not contradict or rebut any of those statements even though the statements were made in front of a third-party non-accomplice (the blue Honda passenger) and even though the statements contained "assertions of fact which, if untrue, the party would under all the circumstances naturally be expected to deny." *Comford, supra*, 947 A.2d at 1185 (D.C.2008) (quoting 2 McCORMICK, *supra*, § 262). Because there was sufficient evidence to support admissibility of the evidence for further consideration by the jury, we hold that the trial court did not abuse its discretion by admitting the evidence.

### III. State of Mind

■ Blackson also argues that the trial court abused its discretion when it denied his request to admit testimony from a passenger in the burgundy Kia that (a) no one in the Kia said "follow that car" and that (b) driver McGee said he was "going to fly right past" the black Pontiac because those statements were properly admissible

---

**6.** The government notes that because the conversation at issue was between Blackson and a passenger in the blue Honda (who therefore was not a witness to the shooting), *see* note 5, *supra*, Yeager's grand jury testimony supports an inference that Blackson himself made many, if not all, of the statements Yeager described, thereby giving rise to an inference that the statements were actually direct admissions. Because this argument was not raised below, however, we decline to consider it. *See, e.g., Hunter v. United States*, 606 A.2d 139, 144 (D.C.1992) ("[P]oints not asserted with sufficient precision [at the trial court level] to indicate distinctly the party's thesis will normally be spurned on appeal." (quotation marks omitted)).

to prove their states of mind. At trial, Blackson argued that the first statement was relevant to proving what the passenger "interpreted to be the intent of [the driver]," while the second statement was relevant to proving the driver's state of mind. On appeal, Blackson specifically argues that those statements would have rebutted "the government's theory that Mr. McGee deliberately slowed down near the black Pontiac to give [Blackson] an opportunity to shoot." Blackson's argument fails, however, as a matter of law.

As noted above, the trial court's decision to admit or exclude evidence is reviewed only for abuse of discretion. *Goines, supra*, 905 A.2d at 799; *Mercer v. United States*, 724 A.2d at 1182. Because "the exercise of that discretion must 'be founded upon correct legal principles,'" *Bell, supra*, 801 A.2d at 125 (citations omitted), however, "[w]hether or not a particular hearsay exception applies to certain statements is a question of law which we review *de novo*." *Dyson, supra*, 848 A.2d at 611.

▮▮▮▮ "[T]he state of mind exception to the hearsay rule allows the admission of extrajudicial statements to show the state of mind of the declarant … if that is at issue in the case." *Clark v. United States*, 412 A.2d 21, 25 (D.C.1980). Blackson's

argument at trial that the passenger's statement that no one said "follow that car" was hearsay and that it was admissible to show either the passenger's "interpretation" of McGee's state of mind or was admissible as evidence of McGee's state of mind necessarily fails as a matter of law for two reasons: (1) there was no hearsay, since the trial testimony was precisely that *no* out of court statement was made;[7] and (2) neither the passenger's nor McGee's states of mind were at issue in the case. As Blackson points out in his brief, "the only dispute in this case was whether [Blackson] shot at the black Pontiac in self-defense or in retaliation." Thus, because it was undisputed that Blackson shot the weapon that killed the decedent, the case turned solely on *Blackson's* state of mind at the time he pulled the trigger—regardless of what the *passenger thought* McGee was intending, regardless of the speed at which *McGee intended* to drive, and regardless of the speed at which McGee *actually did* drive. The second statement (wherein the passenger testified that McGee said he was going to "fly right by" the black Pontiac), unlike the first, *was* hearsay; nonetheless, it too is not admissible under the state of mind exception because neither the passenger's nor

---

7. "'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." *Puma v. Sullivan*, 746 A.2d 871, 875 (D.C.2000) (using the definition in Federal Rule of Evidence 801(c) and noting that that definition is "consistent with well-settled law in the District of Columbia and elsewhere"). "A statement is (1) an oral or written assertion or (2) nonverbal conduct of a person, if it is intended by the person as an assertion." *Little v. United States*, 613 A.2d 880, 882 (D.C.1992) (adopting the definition of "statement" set out in Federal Rule of Evidence 801(a)).

The passenger's testimony that no one said "follow that car" rules out the possibility of

there being a hearsay statement under the first definition, while neither party has ever argued that the people in the Kia intended their nonverbal conduct (*i.e.* silence) to be assertions, nor is there any support for that proposition in the record. Nonetheless, because Blackson does not argue that the passenger's testimony that no one said "follow that car" was actually admissible non-hearsay, we decline to address that issue here. *See, e.g., Hunter, supra*, 606 A.2d at 144 ("[P]oints not asserted with sufficient precision [at the trial court level] to indicate distinctly the party's thesis will normally be spurned on appeal." (quotation marks omitted)).

McGee's states of mind were at issue in the case.[8]

■ Because neither the passenger's nor McGee's states of mind were at issue in this case, the trial court did not abuse its discretion in finding that the statements did not fit the state of mind hearsay exception.[9]

## IV. Witness Fear

■ Blackson argues that the trial court abused its discretion in allowing the prosecution to question Yeager about his reluctance to testify. According to Blackson, "Mr. Yeager's testimony that someone threatened to kill him for snitching in this case was substantially more prejudicial than probative" because that testimony improperly implied that Blackson was responsible for such threats even though there was no evidence of Blackson's involvement. We disagree.

■ Blackson's claim that the admitted evidence was substantially more prejudicial than probative is a "so-called Rule 403 claim," after the policy set forth in Federal Rule of Evidence 403, which this court has adopted. *Comford, supra,* 947 A.2d at 1186, 1186 n. 11. Again, however, the trial court's decision to admit or exclude evidence is reviewed only for abuse of discretion. *Goines, supra,* 905 A.2d at 799; *Mercer v. United States,* 724 A.2d at 1182. Rule 403 "require[s] the judge to assess whether the probative value of [the evidence is] substantially outweighed by the danger of 'unfair prejudice,' which 'means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.' "[10] *Comford* at 1187. However, "Rule 403 tilts in favor of 'admitting as much relevant evidence as it is reasonable and fair to include.' Under Rule 403, '[p]robative evidence should not be excluded because of crabbed notions of relevance or excessive mistrust of juries.' " *Id.* (footnote omitted). Thus, we have emphasized that "the danger of unfair prejudice must *substantially* outweigh probative value before relevant evidence may be excluded." *Id.* at 1188.

■ "Generally, evidence showing the bias or motivation of a witness may be relevant in assessing the witness' credibility." *Ebron v. United States,* 838 A.2d 1140, 1148 (D.C.2003) (quoting *Mercer, supra,* 724 A.2d at 1184). We recognize, however, that "evidence concerning a witness' fear tends to be extremely prejudi-

---

**8.** *See* note 7, *supra.*

**9.** For the first time on appeal, Blackson argues that the trial court's refusal to admit the hearsay evidence he proffered violated his constitutional right to present a complete defense because it " 'arbitrarily and significantly' curtailed the defendant's opportunity to present an exculpatory interpretation of the evidence on a central issue at trial." We need not consider this argument because arguments not raised in the trial court are ordinarily waived on appeal. *See, e.g., Hunter, supra,* 606 A.2d at 144 ("[P]oints not asserted with sufficient precision [at the trial court level] to indicate distinctly the party's thesis will normally be spurned on appeal." (quotation marks omitted)).

We note, however, that to support his argument, Blackson relies on *McDonald v. United States,* 904 A.2d 377, 380 (D.C.2006), which in turn relies on *Crane v. Kentucky,* 476 U.S. 683, 690, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1986). But in *Crane,* the Supreme Court reiterated that the constitutional right to present a defense is not absolute and does not allow the defendant to introduce all evidence that may be helpful. *Id.*

**10.** Blackson does not argue that questioning Yeager about his fear was irrelevant. The relevance inquiry asks whether the evidence had "any tendency to make the existence of any fact that is of consequence more or less probable than it would be without the evidence." *Comford, supra,* 947 A.2d at 1187.

cial because it appeals to the passions of the jury and may cause the jury to base its decision on something other than the rule of law." *Gordon v. United States,* 783 A.2d 575, 586 (D.C.2001). "Therefore, we have cautioned that the admission of such evidence should be limited, 'unless admitted to explain specific behavior of the witness, such as inconsistent statements, delay in testifying, or unusual courtroom demeanor.'" *Ebron, supra,* 838 A.2d at 1148 (citations omitted). Indeed, it is "an abuse of discretion for the trial court to admit such evidence solely for the purpose of reflecting on the general credibility and bias of the witness." *Id.* Evidence meant to explain specific behaviors, however, does "not go only to [the witness's] general credibility." *Mercer, supra,* 724 A.2d at 1190. Moreover, "[e]vidence of threats against a witness may be admitted also to explain why the witness delayed in reporting a crime and courtroom demeanor indicating intimidation may also be admitted to account for the specific behavior of a witness that, if unexplained, could damage a party's case." *Ebron, supra,* 838 A.2d at 1148 (citing *Foreman, supra,* 792 A.2d at 1049) (internal quotation marks omitted).

In *Mercer, supra,* we found no error in allowing a witness's testimony that she "turn[ed] up for court" because she was "scared"; that she "[didn't] want to be here today"; that she "remember[ed] nothing" of her prior testimony; and that she came in to testify because she "perceived there to be a threat by some government agent that if she did not testify, the government would take her children into custody." *Mercer, supra,* 724 A.2d at 1189–90. Admitting the evidence was not error because (1) "the evidence was meant to explain specific behavior of the witness while testifying" and "it did not go only to her general credibility"; (2) "the trial judge instructed the jury on the proper

use of this evidence" by giving a "limiting instruction ... [that] informed the jury that the only reason for the evidence was to place the testimony of the witness in the proper light, and allow them to assess her state of mind and demeanor"; and (3) "the challenged portion of [the witness'] testimony does not appear to implicate [appellant]." *Mercer, supra,* 724 A.2d at 1190.

Here, as in *Mercer,* Yeager's testimony "was meant to explain specific behavior of the witness while testifying," and "the trial judge instructed the jury on the proper use of this evidence" by giving a limiting instruction; and "the challenged portion of [Yeager's] testimony does not appear to implicate" Blackson. Indeed, the prosecution questioned Yeager about his fear only to explain his inconsistent statements, and the trial judge instructed the jury that the evidence could be used only for that purpose. Moreover, not only did the trial court instruct the jury that there was no "evidence that [Blackson] had threatened a witness or any evidence that [Blackson] had any third party threaten [Yeager]," but Yeager's own testimony did not link Blackson to the threats. Rather, Yeager specifically testified that although he had been called a snitch and that although his life had been "somewhat" threatened, he did not "see" those people or know where those people lived, and "nothing [was] never done." Furthermore, the references to such threats appear to have had a factual basis, since it is undisputed that Yeager was actually threatened. Thus, on the facts of this case, the trial court did not abuse its discretion in concluding that the probative value of the testimony was not substantially outweighed by its prejudicial effect.

While Blackson points to other testimony addressed in *Mercer* (which discussed the testimony of multiple witnesses) to support his contrary argument, that por-

tion of the opinion is unavailing in this case. In *Mercer*, we found no abuse of discretion in admitting the portions of another witness's testimony that she had been "scared" upon seeing the appellant's girlfriend with the defense investigator who questioned her; that her fear prompted her to not tell the truth about a particular factual matter; that she lied because she knew her statement "was going to get back to" appellant; that she did not "want to be" in court; and that she was in court only "[b]ecause [she] was subpoenaed," *id.* at 1186, because the witness had been impeached by a prior inconsistent statement and the prosecution merely "sought to rehabilitate [the witness] … by having [her] explain the facts and circumstances that surrounded the prior inconsistent statement." We also held, however, that a different statement from that same witness (that she was not "happy about testifying" at trial "[b]ecause [she] could leave here today and y'all might never see [her] again") should have been "stricken from the record on proper objection or motion and the jury properly instructed." It should have been stricken because it "was not necessary to establish [the witness's] motivation in testifying, or her reluctance" because "the prosecution had already es-

tablished that [she] only testified because of a subpoena, and that she did not want to be in the courtroom"; and because "the prosecution did not appear to have any evidence to form a well reasoned suspicion that [the witness] had received a threat, or if such a threat had occurred, that it came from either [appellant]" in that case. *Id.* at 1186.

This case is distinguishable from the testimony we rejected in *Mercer*. Here, first, there was a factual basis upon which "to form a well-reasoned suspicion" that Yeager had received a threat, since he specifically testified to that fact (as opposed to making statements that, as with the disallowed testimony in *Mercer*, merely implied the existence of threats). Second, no additional possible reason for Yeager's inconsistent testimony had been previously established. Third, there was no mention of Blackson or any of his relatives or close friends in the context of witness intimidation or Yeager's inconsistent statements. Finally, Blackson was never implicated as having caused or desired the threats (indeed, there was an instruction by the court specifically to the contrary). Other case law cited by Blackson is likewise unavailing.[11]

---

11. For example, Blackson correctly notes that *Gordon, supra,* held that it was an abuse of discretion for the court to have allowed the government to "pressure[] [the witness] to testify that it was her fear of the appellants that was causing her to testify inconsistently" and recant her earlier grand jury testimony. *Id.* at 588. Unlike the testimony at issue in this case, however, the testimony in *Gordon* implicated the appellants directly. *Id.* at 585 (witness stating that she was "less afraid" when she testified before the grand jury and that she didn't "want to say the things that [she] saw" because "You know why. I live right down the street from these people. I am scared for my life"). Moreover, the trial judge in this case provided a limiting instruction regarding the proper use of the testimony, a fact which appears to have been lacking in *Gordon*. *See Gordon, supra,* 783 A.2d at 583–89 (making no mention of a limiting instruction).

Likewise, as Blackson correctly notes, *Carpenter v. United States*, 635 A.2d 1289 (D.C. 1993), held that although witness testimony about her fear of "snitches being killed in the neighborhood," *id.* at 1293, and about her confrontation with the appellant's family was "relevant and admissible for the limited purpose of explaining the fears that had kept [her] away from the police," *id.* at 1294, the trial court abused its discretion in admitting her additional testimony about being assaulted several weeks before trial. Blackson fails to note, however, that the holding in that case was specifically conditioned on the order in which the evidence was presented (discussion of snitches, followed by the story of the con-

For the foregoing reasons, the decision of the trial court is

*Affirmed.*

OBERLY, Associate Judge, concurring.

I join the majority in affirming Blackson's convictions but I write separately because I would travel a different path than the majority. I find the trial court erred in admitting Yeager's grand jury testimony as "adoptive admissions" against Blackson, but I also find the error was harmless under the applicable standard of *Kotteakos v. United States*, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946).

frontation with the sister, followed by the story of being assaulted by unidentified assailants). Indeed, the full holding reads, "[i]n sum, the chronology of [the witness']s testimony on redirect ... very likely led the jury to associate appellants or their families with the assault on [the witness]—even though there was no evidence whatsoever linking appellants or their families to that assault." *Id.* Here, there was no such implicating chronology.

In fact, "[o]ur decisions have made timing a significant factor in assessing the prosecution's need to counter 'damage [to its] case' by adducing reasons for a witness' lack of cooperation on the stand." *Blunt v. United States*, 959 A.2d 721, 725 (D.C.2008). Thus, in *Blunt*, we held that the witness' having testified about having "been stabbed nine times and almost lost [her] life by testifying" before the grand jury in that case was substantially more prejudicial than probative, even though the judge instructed the jury that there was no evidence that the appellant in that case had "participated in [or was] any way connected to that incident," because the witness "testified about the stabbings on direct examination, before the defense exercised its choice on cross-examination whether to attack her veracity in purportedly being unable to recall events or her prior testimony." *Id.* As a result, "[j]urors finding her sincere could be tempted to 'speculate,' despite the court's limiting instruction, that no one else had the same motive to retaliate as did [appellant] or persons acting for him," *id.* (footnote omitted), and "proper testimony by [the witness] on direct about the reason for her fear of testifying should have been limited ... to a general statement that she feared retaliation." *Id.* In the case at bar, however, the prosecution questioned Yeager about his reluctance to testify on *re-direct* examination, after the defense had chosen to use its opportunity to cross-examine Yeager to imply that made up his prior grand jury testimony (which, unlike Yeager's testimony at trial, implicated appellant in the shooting) only because he "knew that [the police] had asked [him] about [appellant]" and he "knew that they wanted information on that" and "thought if I give them this information I can get help on my own cases."

Moreover, even though the testimony in *Blunt* was erroneously admitted, the error was held harmless under *Kotteakos v. United States*, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946), in light of the "instruction that the trial judge gave, forcefully and immediately, after [the witness] explained her fear," which "provide[d] some assurance that the jury did not blame [appellant] for the stabbings and so treat them as evidence of his bad character or consciousness of guilt"; the prosecutor's decision not "to exploit the link between fear and the defendant in summation"; the fact that the testimony came on the first day of trial and was succeeded by various other witnesses; the fact that the jury appeared "not swayed by any 'specious link'" between appellant and the post-crime stabbings in light of requested guidance from the court during deliberations; and the fact that the evidence that the appellant—convicted of voluntary manslaughter—"killed [the decedent] with cinder blocks without adequate provocation was very substantial." *Blunt, supra*, 959 A.2d at 726–27. Here, there was a prompt and forceful limiting instruction; the prosecutor did not attempt to link Blackson with Yeager's fear during summation; Yeager's testimony was both preceded and followed by other witnesses; and, unlike the witness in *Blunt*, Yeager was never actually harmed by anyone for his participation in the case. Moreover, the evidence against Blackson in this case was very strong, since, as Blackson notes, "the only dispute in this case was whether [Blackson] shot at the black Pontiac in self-defense or in retaliation." Thus, even assuming *arguendo* that the evidence was erroneously admitted, that error would have been harmless.

While the test for the admissibility of "adoptive admissions" is of course not drawn from the "five Ws" taught in journalism school (the "who, what, when, where and why" questions every story should answer), those questions come to mind as one considers whether the evidence in this case permitted the trial court to "make a preliminary determination [that the] jury could reasonably conclude that the defendant unambiguously adopted another person's incriminating statement." *Holmes v. United States,* 580 A.2d 1259, 1264 n. 8 (D.C.1990). I am of the view that the evidence was insufficient for the trial judge to reach that determination. On the contrary, the evidence establishes precious little to answer the key questions relevant to the adoptive admissions analysis: Who was telling the story? Was Blackson paying attention? Where was Blackson? How did Blackson manifest his assent (or acquiesce in the statements)? The record does not answer these questions. Instead, all we know is that Blackson was "there," in the back yard of someone's house, when a group of five people, including Yeager, were "walking off, walking back, walking off walking back" while engaged in some sort of conversation about the shooting that had occurred the night before. That is plainly insufficient to allow the trial judge to permit the jury to find that Blackson "unambiguously" adopted other people's statements and admit into evidence what would otherwise be rank hearsay against Blackson.

Our court has recognized that "adoptive admissions" present significant risks of unreliability that caution against their admission into evidence in all but the plainest of circumstances. As we said in *Holmes,* "[t]here are great possibilities of error in relying on oral utterances which are supposed to have been heard, understood, and acknowledged by the defendant." 580 A.2d at 1259 (internal citations omitted).

Here, the trial judge recognized the serious potential for unreliability when he said "part of the problem is that [Yeager] gives a whole recitation and this wasn't done in a way where it could be clear who is making the statements, whether they're admissions or whether statements made by others that may ultimately be hearsay. Because it wasn't parsed out as who is saying what. . . . And without it being clear who said what, it's hard for the Court to glean what are [admissions] what are not [admissions]." Ultimately, however, the court allowed the government to introduce the statements as adoptive admissions because Blackson was "present" and "in a position where you would expect that if things didn't occur the way they were describing them he would have said something."

That is simply not enough to meet the demanding standard necessary for a reasonable jury to find that it "clearly appear[ed]" that Blackson "understood and unambiguously assented to the statements." *Harris v. United States,* 834 A.2d 106, 117 (D.C.2003) (citations omitted). Why should one expect Blackson to deny the statements if, for all the record shows, he was not physically positioned to hear them? Perhaps instead he was "walking off, walking back" and hence out of earshot when some or even all of the statements were made. Such possibilities are why "judicial resort to the adoptive admission doctrine may provide an open invitation to manufacture evidence, or to make something out of nothing or very much out of very little." *Holmes,* 580 A.2d at 1263 (internal citation omitted).

Even though I conclude that the trial court erred in admitting Yeager's statements as "adoptive admissions," I join the majority in affirming Blackson's convictions because I find the trial court's error was harmless. Blackson admits he shot Jones; the only question is whether the

government negated Blackson's theory of self-defense. The record plainly establishes that the government did so, and it did so with no help from Yeager. Although the car in which Blackson was traveling was going slowly, nobody except Blackson in either Blackson's car or Jones's car claimed to have seen anyone from Jones's car point a gun at Blackson. And after the shooting, Blackson told his friend McGee that he was "bamming out" and "had to do what [he] had to do" in case "they [*i.e.*, the Butler Gardens group] would have tried to get us again ... so [he] had to get them back." Blackson subsequently told McGee "don't worry about nothing" because "if anything happens, then it's all going to come back on [Blackson]."

The government presented additional evidence to negate Blackson's theory of self-defense but even this brief recitation is sufficient to establish that it is "highly probable" that the error in admitting the "adoptive admissions" did not have "a substantial and injurious effect or influence in determining the jury's verdict." *Kotteakos*, 328 U.S. at 776, 66 S.Ct. 1239. I therefore join in the judgment.